UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

VICTORIA GABLE, COURTNEY JOBBA, and SARAH PALFY,

Plaintiffs,

-against-

VETERANS OF FOREIGN WARS OF THE UNITED STATES, DEPT. OF NEW JERSEY; VETERANS OF FOREIGN WARS OF THE UNITED STATES, DEPT. OF NEW JERSEY POST 2445; and JAMES RENWICK,

Defendants.

Case No.: 1:26-cv-10168

**COMPLAINT**

Plaintiffs VICTORIA GABLE ("Plaintiff Gable"), COURTNEY JOBBA ("Plaintiff Jobba"), and SARAH PALFY ("Plaintiff Palfy") (collectively, as "Plaintiffs"), by and through their attorneys, JOSEPH & NORINSBERG LLC, hereby allege against Defendants VETERANS OF FOREIGN WARS OF THE UNITED STATES, DEPT OF NEW JERSEY ("VFW"); VETERANS OF FOREIGN WARS OF THE UNITED STATES, DEPARTMENT OF NEW JERSEY, POST 2445 ("Post 2445" or the "Post"); and JAMES RENWICK, aka JAY ("Renwick" or the "Individual Defendant") (collectively, "Defendants"), upon knowledge as to their own acts and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. Plaintiffs bring this action pursuant to: (a) the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), and the regulations promulgated thereunder; (b) the New Jersey Wage and Hour Law, N.J.S.A. §§ 34:11-56a et seq. ("NJWHL"); (c) the New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 et seq. ("NJWPL"); and (d) the New Jersey Wage Theft Act ("NJWTA"), based upon Defendants' unlawful compensation practices, including but not limited to their failure to pay Plaintiffs lawful minimum wages, failure to comply with

statutory tip-credit requirements, failure to maintain accurate payroll records, and failure to furnish legally required wage notices and wage statements.

2. Defendants knowingly, intentionally, and willfully engaged in a policy, pattern, and practice of violating the FLSA, NJWHL, NJWPL, and NJWTA by, inter alia:

a. improperly classifying Plaintiffs as "volunteers";
b. failing to pay lawful minimum wages;
c. failing to properly compensate Plaintiffs for all hours worked;
d. failing to maintain accurate payroll and time records; and
e. failing to provide lawful wage notices and wage statements.

3. Plaintiffs further bring this action pursuant to the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 et seq. ("NJLAD"), based upon Defendants' creation, maintenance, and tolerance of a hostile work environment through severe and pervasive sexual harassment directed toward Plaintiffs and other female employees.

4. Plaintiff Gable further alleges that Defendants subjected her to *quid pro quo* sexual harassment by conditioning, explicitly and implicitly, the terms and conditions of her employment upon her submission to unwelcome sexual conduct.

5. Plaintiffs further allege that Defendants unlawfully retaliated against them in violation of the NJLAD after Plaintiffs complained about, opposed, and/or reported discriminatory, harassing, retaliatory, and unlawful conduct in the workplace.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. This Court further possesses supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same common nucleus of operative facts and form

part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants transact business within this District, and because a substantial part of the acts, omissions, and unlawful employment practices giving rise to the claims alleged herein occurred within this District.

## DEMAND FOR JURY

8. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in this action.

## COLLECTIVE ACTION ALLEGATIONS

9. Plaintiffs seek to bring this suit to recover from Defendants unpaid minimum wage compensation and liquidated damages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on their own behalf, as well as on behalf of those in the following collective:

a. Current and former bartenders and employees who, during the applicable FLSA limitations period, performed any work for any of the Defendants, and who consent to file a claim to recover damages for: (1) minimum wage compensation that is legally due to them; and/or (2) liquidated damages that are legally due to them ("FLSA Plaintiffs").

10. Defendants treated Plaintiffs and all FLSA Plaintiffs similarly in that Plaintiffs and all FLSA Plaintiffs: (1) performed similar tasks, as described below; (2) were subject to the same laws and regulations; (3) were paid in the same or similar manner; and (4) were not paid the required minimum wage.

11. At all relevant times, Defendants are and have been aware of the requirements

to pay Plaintiff and all FLSA Plaintiffs at the minimum wage, yet they purposefully and willfully chose and choose not to do so.

12. Defendants exercised complete control over every aspect of Plaintiffs' work.

13. The precise number of FLSA Plaintiffs should be readily available from a review of the Defendants' personnel, scheduling, time, and payroll records, and from input received from the collective action as part of the notice and "opt-in" process provided by 29 U.S.C § 216(b).

**RULE 23 CLASS ACTION ALLEGATIONS**

14. Plaintiffs bring claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all current and former employees, including bartenders and employees in similar positions, employed by Defendants on or after the date that is six (6) years prior to the filing of the Complaint in this case (the "Class Members").

15. All said persons, including Plaintiffs, are referred to herein as the "Class." The Class Members are readily ascertainable. The number and identities of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and the rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

16. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, as the facts on which the calculation of that number rests are presently within the sole control of Defendants, upon

information and belief, the class includes dozens of individuals representing nearly ninety percent of Defendants' workforce during the relevant time period.

17. Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions. All the Class Members were subject to the same unlawful failure by Defendant to pay the required minimum wage.

18. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiffs and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

19. Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class. Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

20. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to

redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

21. Defendants and other employers violate state wage laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

22. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a. whether Defendants employed Plaintiffs and Class Members within the meaning of the state wage laws;

b. What were and are the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which

Defendants did not pay Plaintiffs and the Class Members;

c. At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiffs and Class Members for their work;

d. Whether Defendants properly notified Plaintiffs and Class Members of their hourly rate;

e. Whether Defendants properly compensated Plaintiffs for their hourly rate;

f. Whether Defendants paid Plaintiffs and Class Members for the actual hours that they worked;

g. Whether Defendants paid Plaintiffs and Class Members at the appropriate minimum wage.

**THE PARTIES**

23. Defendant VFW is a nonprofit organization organized and existing under the laws of the State of New Jersey.

24. Defendant VFW Post 2445 is a subordinate post of the VFW located at 914 East Main Street, Maple Shade, New Jersey.

25. The VFW operates, oversees, controls, and/or exercises authority over the operations, policies, and practices of Post 2445.

26. At all relevant times herein, Defendant JAMES RENWICK ("Renwick") was a manager, officer, employee, and/or agent of the VFW and Post 2445.

27. At all relevant times herein, Defendants were Plaintiffs' "employers" within the meaning of the FLSA, the NJWHL, and the NJLAD.

28. At all relevant times herein, Defendants possessed and exercised the authority

to hire and fire employees, supervise and control employee work schedules and conditions of employment, determine the rate and method of compensation, assign job duties, and maintain employment records for Plaintiffs and similarly situated employees.

29. At all relevant times herein, Defendants constituted an enterprise engaged in interstate commerce within the meaning of the FLSA, employed two or more employees, and generated annual gross revenues in excess of $500,000.00.

30. At all relevant times herein, Defendants were employers engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA.

31. Defendants constituted an "enterprise" within the meaning of the FLSA.

32. At all relevant times herein, Plaintiffs were engaged in interstate commerce within the meaning of the FLSA.

33. Within the applicable statutory period, Plaintiffs were employed by Defendants as bartenders at Post 2445.

34. Defendant Renwick is sued in his individual capacity as an officer, manager, employee, and/or agent of the VFW and Post 2445.

35. At all relevant times herein, Defendant Renwick exercised sufficient operational control over Post 2445's operations and Plaintiffs' employment to qualify as Plaintiffs' employer under the FLSA and NJWHL.

36. Defendant Renwick initially served as Senior Vice Commander of Post 2445 and later assumed the position of Commander.

37. In those roles, Defendant Renwick exercised supervisory authority over Post 2445's operations, staffing decisions, and the day-to-day management of the Post's canteen and bar operations.

38. Defendant Renwick directly supervised Plaintiffs, controlled and dictated their work schedules, assigned their duties, and determined their compensation.

39. Defendant Renwick possessed and exercised the authority to hire, discipline, and terminate Plaintiffs.

## FACT ALLEGATIONS

***FLSA & NJWHL Violations***

40. At all times relevant herein, Defendants intentionally, knowingly, and willfully engaged in a pattern and practice of violating the FLSA, NJWHL, NJWPL, and NJWTA, thereby economically injuring Plaintiffs and similarly situated employees.

41. Defendants maintained a policy and practice of failing to pay Plaintiffs and similarly situated employees the lawful minimum wage required under federal and New Jersey law.

42. Defendants further maintained a policy and practice of failing to properly compensate Plaintiffs for all hours worked, including but not limited to pre-shift work, post-shift work, cleaning duties, managerial duties, inventory duties, event-related duties, and other non-tipped labor.

43. Defendants attempted to avoid their legal obligations under the FLSA and NJWHL by improperly characterizing Plaintiffs and similarly situated bartenders as "volunteers," despite the fact that Plaintiffs performed regular operational work essential to the Defendants' business operations with the expectation of compensation.

44. At all relevant times herein, Plaintiffs performed compensable work for Defendants with the understanding and expectation that they would be paid for such work.

45. Specifically, Plaintiffs were paid a flat amount "per shift" and were permitted

to retain tips received during their shifts.

46. Each bartending shift typically lasted approximately six to eight hours.

47. Plaintiffs also regularly performed additional compensable work before and after their scheduled shifts, including but not limited to:

a. opening duties;
b. closing duties;
c. cleaning;
d. stocking;
e. inventory management;
f. shopping for supplies;
g. event preparation;
h. supervising other bartenders;
i. handling customer disputes; and
j. cash reconciliation.

48. Plaintiffs' compensation routinely fell below the applicable minimum wage required under the FLSA and NJWHL.

49. Defendants failed to maintain accurate records of Plaintiffs' hours worked.

50. Defendants failed to provide Plaintiffs with wage notices at the time of hire or at any point during their employment.

51. Defendants failed to furnish Plaintiffs with wage statements and/or paystubs as required by the NJWPL.

52. Upon information and belief, Defendants failed to report some or all wages paid to Plaintiffs to the appropriate taxing authorities.

53. No Plaintiff ever received:

a. a written tip-credit notice;
b. a wage notice; or
c. a paystub.

54. Defendants failed to inform Plaintiffs that they were being treated as tipped employees under the FLSA and NJWHL.

55. Defendants failed to provide Plaintiffs with notice of:

a. the amount of cash wages being paid;
b. the amount of any claimed tip credit;
c. the manner in which any tip credit would be calculated;
d. any tip pooling arrangement;
e. Plaintiffs' regular rate of pay; or
f. Plaintiffs' overtime rate of pay.

56. As a result of Defendants' failure to comply with the statutory notice requirements governing tipped employees, Defendants are not entitled to claim any tip credit against their minimum wage obligations.

57. Defendants further failed to maintain accurate records of Plaintiffs' schedules, hours worked, wages paid, tips received, and payroll information as required under the FLSA and NJWHL.

58. Each plaintiff was also required to participate in an annual event held in the beginning of September in which the Defendants required all bartenders to work unpaid all day. The bartenders in the back bar were required to "donate" their tips back to the Post for this event.

***Plaintiff Gable***

59. Plaintiff Gable worked for Defendants from approximately February 2014 to August 2024 as a bartender at Post 2445.

60. Initially, Defendants compensated Plaintiff Gable approximately $20.00 per shift, in addition to customer tips.

61. Throughout much of her employment, Plaintiff Gable worked approximately 40 hours per week.

62. In addition to bartending duties, Plaintiff Gable regularly performed substantial managerial and operational work without proper compensation.

63. Over the course of her approximately ten-year tenure, Plaintiff Gable assumed substantial managerial responsibilities and ultimately served as the Post's Bar Manager, at which point she made $40 per shift.

64. Upon information and belief, the Post's bylaws designated the Bar Manager position as a compensated role paying approximately $250.00 per week.

65. Despite the substantial managerial duties she performed, Defendants failed to properly compensate Plaintiff Gable for her labor.

66. As Bar Manager, Gable's responsibilities included, but were not limited to:

a. preparing bartender schedules;
b. managing inventory;
c. placing supply orders;
d. purchasing supplies;
e. coordinating bar operations;
f. supervising bartenders;
g. responding to emergencies;
h. training employees; and
i. cleaning the facility.

67. Gable routinely remained on call 24 hours per day, 7 days a week for operational issues arising at the Post.

68. Plaintiff Gable also cleaned the facility six days per week in addition to her bartending and managerial duties.

69. Throughout her employment, Plaintiff Gable reported directly to Defendant Renwick.

***Plaintiff Jobba***

70. Plaintiff Jobba began bartending at the Post in September 2018, initially working one shift per week at approximately $20 per shift plus tips. Plaintiff Jobba's compensation eventually increased to $40 per shift.

71. Ms. Jobba started working two shifts per week after the Post shut down for the COVID pandemic starting in the late summer of 2020. She worked the day shift on Thursday and would also step in to cover parties on weekends. She worked approximately 14 to 16 hours per week.

72. As the Post experienced chronic turnover among its female bartenders, Ms. Jobba's responsibilities expanded significantly, and as she picked up two additional shifts. These shifts added 12 more hours per week, bringing her total up to 20 hours per week.

73. In October 2024, Ms. Jobba also took over management of the Post's event hall, including completing contracts and bookings. This responsibility added between 3 and 5 additional hours per week to her schedule. This work was completely unpaid.

74. Ms. Jobba worked diligently for the Post until December 10, 2025, when Defendant Renwick's retaliatory behavior ended her employment.

***Plaintiff Palfy***

75. Plaintiff Palfy joined the Post as a bartender in September 2018.

76. Palfy consistently worked Saturdays, starting at 4:45 p.m. and usually closing between midnight and 2 a.m.

77. Palfy would also pick up other shifts on an as-needed basis, usually working approximately 10-15 hours per week total.

78. Plaintiff Palfy was initially paid $15 per shift and was permitted to retain tips; her pay was eventually raised to $20 per shift.

79. Plaintiff Palfy performed her bartending duties reliably and professionally, serving the Post's membership and contributing to the organization's operations until August 2023, when she was forced to resign.

80. In 2023, Plaintiff Palfy objected to participating in the annual September event in which bartenders were required to donate their tips and work for completely free.

81. In response to Plaintiff Palfy's complaints, Individual Defendant took away one of her most lucrative shifts, costing her several hundred dollars in tips.

82. Plaintiff Palfy then resigned due to Individual Defendant's retaliation against her.

***Hostile Work Environment and Sexual Harassment***

83. Throughout Plaintiffs' employment, Defendant Renwick subjected Plaintiffs and other female employees to severe, pervasive, unwelcome, and objectively offensive sexual harassment.

84. Defendant Renwick exploited his authority as Commander to create and maintain a workplace culture in which sexually inappropriate behavior toward female bartenders was normalized and tolerated.

85. Defendant Renwick routinely made sexually explicit comments in the workplace, including but not limited to comments regarding female employees' bodies, sexual acts or performance, and employees' physical appearance.

86. Defendant Renwick frequently engaged in unwanted physical touching of female employees, including but not limited to slapping female bartenders on their buttocks.

87. On approximately six occasions, Defendant Renwick pulled Plaintiff Gable aside and coerced her into lifting her shirt and "flashing" him. She resisted and refused, but he would insist, saying "I want to see."

88. Defendant Renwick regularly discussed sexual acts and women's bodies in front of Plaintiffs and patrons.

89. For example, Defendant Renwick frequently made comments about where he wanted to "put his dick" in the presence of Plaintiffs and customers.

90. On one occasion, Defendant Renwick commented to Plaintiff Jobba that his girlfriend had "pancake tits."

91. On another occasion, after Plaintiff Gable hired a female bartender named Kelly, Defendant Renwick revoked Gable's hiring authority and stated that Kelly "looks like an Amazon," implying she was insufficiently attractive to work at the Post.

92. Upon information and belief, Defendant Renwick maintained nude photographs of at least one female bartender on his cellular phone and showed those photographs to employees and/or patrons.

93. Defendant Renwick openly mocked workplace sexual harassment policies, including refusing to participate in mandatory sexual harassment policy readings conducted by the VFW.

94. Between 2014 and 2019, Gable developed a relationship of trust with Defendant Renwick and confided in him regarding prior sexual harassment she experienced during her military service.

95. Beginning in 2019, Defendant Renwick began making overt sexual advances toward Gable.

96. Defendant Renwick used his supervisory authority, emotional pressure, and control over Gable's employment conditions to pressure her into a sexual relationship.

97. Gable reasonably feared that rejecting Defendant Renwick's advances would negatively affect her employment and standing at the Post.

98. At one point, Defendant Renwick disclosed that a former partner had

transmitted a sexually transmitted infection to him, causing Gable severe emotional distress and forcing her to seek medical testing.

99. In approximately June 2024, Defendant Renwick pressured and coerced Gable into participating in a sexual interaction involving another woman despite Gable's visible and verbal discomfort and reluctance.

100. Following this incident, Defendant Renwick's treatment of Gable deteriorated. He began criticizing Gable, blaming her for alleged financial problems at the Post, undermining her authority, and treating her with hostility.

101. In approximately August 2024, Defendant Renwick became enraged with Gable over a scheduling issue with reserving pool tables.

102. Immediately thereafter, while Gable stood in the Post parking lot, Defendant Renwick and his girlfriend drove slowly past her while Renwick's girlfriend screamed insults, including calling Gable a "bitch."

103. As a direct result of the intolerable and humiliating working conditions created by Defendants, Gable felt she had no reasonable alternative except to resign.

104. Following Gable's resignation, Defendants hired an unexperienced replacement whom they offered to pay $250 per week. Gable had never received any pay other than tips for the same position, outside of a $1,000 annual bonus in December. She had never been told that any money was allocated for her to be paid for the position.

105. Palfy and Jobba likewise endured repeated sexual harassment throughout their employment.

106. Defendant Renwick subjected Palfy to repeated sexually inappropriate comments concerning her body, clothing, and appearance. On one occasion, Defendant

Renwick also pressured Palfy to serve alcohol to his underage daughter and took a shift away from Palfy when she refused.

107. Defendant Renwick also told crude sexual jokes and engaged in explicit sexual conversations in Palfy's presence that had no legitimate connection to workplace operations.

108. In or around May 2025, prospective Quartermaster John Bearden informed Jobba during her shift that she would be "blowing him" once he "got the VFW straightened out."

109. The statement was made in the workplace, during Jobba's shift, while Bearden was acting under apparent authority at the Post. This comment was made in front of Renwick's neighbor, a customer Plaintiff Jobba knew as Cody.

110. Cody immediately contacted Jobba afterward and confirmed hearing the statement, further remarking that Defendant Renwick "does the same thing" and would not care about Bearden's conduct.

111. Jobba reported Bearden's conduct to Defendants and to the Post's Board.

112. On or about October 16, 2025, during a breast cancer awareness fundraiser, Jobba discussed concerns regarding a hereditary cancer gene and the possibility of developing breast cancer.

113. In response, Defendant Renwick laughed and offered to "feel her boobs" to "check for her."

114. Defendants' conduct was severe, pervasive, humiliating, threatening, and objectively offensive, and altered the terms and conditions of Plaintiffs' employment.

115. Plaintiffs experienced anxiety, humiliation, embarrassment, loss of dignity, emotional distress, sleep disturbance, and fear of retaliation.

116. Plaintiffs reasonably believed that complaining internally would be futile because Defendant Renwick was the highest-ranking authority at the Post; the Post lacked any meaningful HR structure; prior complaints were ignored; and Plaintiffs feared retaliation.

117. Despite receiving notice of the harassment described herein, Defendants failed to take prompt or effective remedial action.

118. The VFW possessed authority to investigate, discipline, suspend, remove, and/or otherwise control Defendant Renwick's authority at Post 2445.

119. The VFW received notice of complaints concerning Defendant Renwick's conduct, including a letter written by Gable in August 2025, and failed to take appropriate corrective action.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Failure to Pay Minimum Wages Under the FLSA on Behalf of All FLSA Plaintiffs)**

120. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

121. The FLSA requires employers to pay employees at least the federally mandated minimum wage for all hours worked.

122. Throughout Plaintiffs' employment, Defendants failed to compensate Plaintiffs and the FLSA Plaintiffs at the applicable minimum wage for all hours worked.

123. Defendants further failed to satisfy the statutory requirements necessary to claim a tip credit under the FLSA, including but not limited to failing to provide Plaintiffs and similarly situated employees with proper tip-credit notices.

124. As a result, Defendants are not entitled to claim any tip credit against their minimum wage obligations.

125. Defendants' violations of the FLSA were intentional, knowing, and willful.

126. As a result, Defendants are liable to Plaintiffs and the FLSA Plaintiffs for unpaid minimum wages, liquidated damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Failure to Pay Minimum Wages Under the NJWHL and NJWTA on Behalf of the Rule 23 Class)**

127. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

128. The NJWHL requires employers to pay employees no less than the applicable New Jersey minimum wage for all hours worked.

129. Throughout Plaintiffs' employment, Defendants compensated Plaintiffs and other similarly-situated employees through flat shift payments and tips that routinely fell below the minimum wage required under New Jersey law.

130. Defendants further failed to comply with New Jersey's statutory requirements governing tipped employees and tip-credit practices.

131. Defendants also failed to maintain accurate payroll and timekeeping records as required by the NJWHL and NJWTA.

132. Defendants' conduct was knowing, intentional, and willful.

133. As a result, Defendants are liable to Plaintiffs and the Rule 23 Class Members for unpaid wages, liquidated damages, statutory penalties, attorneys' fees, costs, and all other available relief under the NJWHL and NJWTA.

**THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Failure to Furnish Wage Notices and Wage Statements Under the NJWPL on Behalf of the Rule 23 Class)**

134. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above

with the same force and effect as if more fully set forth herein.

135. The NJWPL requires employers to provide employees with accurate wage notices and wage statements containing statutorily required payroll information.

136. Defendants failed to provide Plaintiffs and similarly-situated employees with hiring notices, wage notices, accurate paystubs, and/or wage statements throughout their employment.

137. Defendants further paid Plaintiffs and similarly-situated employees off the books and failed to maintain accurate payroll records.

138. Defendants' violations were knowing and willful.

139. As a result, Defendants are liable for statutory damages, unpaid wages, liquidated damages, attorneys' fees, costs, and all other relief available under the NJWPL.

**FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Hostile Work Environment and Sexual Harassment Under the NJLAD)**

140. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

141. Defendants violated the NJLAD by subjecting Plaintiffs to severe and pervasive sexual harassment because of their gender.

142. As detailed above, Defendant Renwick engaged in repeated sexually explicit comments, inappropriate sexual discussions, unwanted touching, humiliation, intimidation, and other offensive conduct directed toward Plaintiffs and other female employees.

143. The harassment described herein was unwelcome, objectively offensive, and sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs' employment.

144. Defendants knew or should have known about the harassment and failed to take prompt and effective remedial action.

145. Defendants received complaints regarding Defendant Renwick's conduct from Plaintiffs and/or other employees but permitted the conduct to continue unabated.

146. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs suffered emotional distress, humiliation, embarrassment, anxiety, loss of dignity, mental anguish, and other compensatory damages.

147. Defendants' conduct was intentional, malicious, willful, wanton, and/or performed with reckless disregard for Plaintiffs' protected rights.

148. Accordingly, Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees, costs, and all other relief available under the NJLAD.

**FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Quid Pro Quo Sexual Harassment Under the NJLAD — Plaintiff Gable)**

149. Plaintiff Gable repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

150. Defendant Renwick used his supervisory authority and control over Gable's employment to pressure and coerce her into a sexual relationship and/or sexual conduct.

151. Gable reasonably believed that refusing Defendant Renwick's sexual advances would negatively affect her employment.

152. After Gable rejected and/or resisted Defendant Renwick's conduct, Defendant Renwick retaliated against her by undermining her authority, criticizing her performance, treating her with hostility, and creating intolerable working conditions.

153. As a direct and proximate result of Defendants' conduct, Gable suffered damages including emotional distress, humiliation, embarrassment, loss of income, and other economic and non-economic damages.

**SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Retaliation Under the NJLAD)**

154. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

155. Plaintiffs engaged in protected activity by opposing, reporting, and/or complaining about unlawful sexual harassment, discrimination, and retaliation in the workplace. Gable resisted Defendant Renwick's advances and submitted complaints regarding Defendant Renwick's conduct to the VFW, and Jobba complained regarding Bearden's sexually explicit comments.

156. Defendants thereafter retaliated against Plaintiffs by subjecting them to hostility, adverse treatment, discipline, suspension, loss of hours, intimidation, and/or constructive discharge.

157. As a direct and proximate result of Defendants' retaliation, Plaintiffs suffered economic losses, emotional distress, humiliation, and other damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

a. Declaring that Defendants violated the FLSA, NJWHL, NJWPL, NJWTA, and NJLAD;
b.
c. Designation of this action as an FLSA collective action on behalf of Plaintiffs and FLSA Plaintiffs, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to the FLSA Plaintiffs, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

d. Designation of this action as a Fed.R.Civ.P. 23(b)(3) class action on behalf of Plaintiffs and Rule 23 Plaintiffs, and prompt issuance of notice pursuant to Fed.R.Civ.P. 23(c)(2) to the Rule 23 Plaintiffs, apprising them of the pendency of this action, and tolling of the statute of limitations;

e. Designation of Plaintiffs and undersigned counsel as class and collective action representatives under the FRCP and FLSA;

f. Awarding Plaintiffs all unpaid minimum wages, unpaid compensation, unlawfully withheld wages, and all other wages due and owing under federal and New Jersey law;

g. Awarding Plaintiffs liquidated damages pursuant to the FLSA, NJWHL, NJWPL, and NJWTA;

h. Awarding compensatory damages in an amount to be determined at trial for Plaintiffs' economic losses, including but not limited to lost wages, lost earnings, lost employment benefits, loss of future earnings, and other pecuniary losses;

i. Awarding compensatory damages in an amount to be determined at trial for Plaintiffs' emotional distress, humiliation, embarrassment, mental anguish, emotional pain and suffering, loss of dignity, loss of self-esteem, anxiety, and other non-economic damages;

j. Awarding punitive damages against Defendants in an amount sufficient to punish Defendants for their willful, malicious, reckless, and/or intentional conduct and to deter similar conduct in the future;

k. Awarding pre-judgment interest and post-judgment interest as permitted by law;

l. Awarding Plaintiffs reasonable attorneys' fees, litigation expenses, expert fees, and costs incurred in the prosecution of this action;

m. Awarding statutory penalties available under the NJWPL and NJWTA;

n. Awarding such other, additional, and further relief as the Court deems just, proper, and equitable.

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I, Diego O. Barros, Esq., counsel for Plaintiffs in the above- captioned action, certify pursuant to Local Civil Rule 11.2 and under penalty of perjury pursuant to 28 U.S.C. § 1746 that, to the best of my knowledge, information, and belief, the matter in controversy is not the subject of any other pending action in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: August 11, 2026
New York, New York

Respectfully submitted,



Diego Barros, Esq.
Joseph & Norinsberg, LLC
825 3rd Ave, 21st Floor
New York, NY, 10022
(212) 227-5700
*Attorneys for Plaintiffs*